**LONE STARR MULTI–THEATRES, LTD., Appellant,**

v.

**MAX INTERESTS, LTD., Appellee.**

No. 01–10–00708–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 29, 2011.

Clinard J. Hanby, The Woodlands, TX, Robert E. Birne, Robert E. Birne PC, Dallas, TX, Susan J. Taylor, Taylor Law Group, Houston, TX, for Appellant.

David W. Holman, Nicole J. Petrelli, The Holman Law Firm, P.C., Houston, TX, Andrew P. McCormick, McCormick, McNeel, Elder & Williams, L.L.P., Bellaire, TX, for Appellee.

Panel consists of Justices JENNINGS, BLAND, and MASSENGALE.

## OPINION

TERRY JENNINGS, Justice.

Appellant, Lone Starr Multi–Theatres, Ltd. ("Lone Starr"), challenges the trial court's judgment, entered after a jury trial, in favor of appellee, Max Interests, Ltd. ("Max"), on Max's claim against Lone Starr for breach of contract. In its first issue, Lone Starr contends that the evidence is legally and factually insufficient to support the jury's findings that it breached its lease agreement with Max and Max was damaged by this breach. In this issue, Lone Starr also contends that these findings are immaterial to the extent that the jury was "called upon" to interpret the lease. In its second issue, Lone Starr contends that the jury's findings did not provide a basis for the trial court to award Max $25,800 for lost rent and the evidence is legally and factually insufficient to support the "implied finding" that Max lost this amount of rent as a result of Lone Starr's breach of the lease. In its third issue, Lone Starr contends that it established as a matter of law that Max unlawfully retained Lone Starr's security deposit and the evidence is legally insufficient to support the jury's finding that Max had provided Lone Starr with a "written description and itemized list of all deductions" from Lone Starr's security deposit.[1] In its fourth, fifth, and sixth issues, Lone Starr contends that the trial court erred in not admitting the testimony of its witness

---

1. *See* TEX. PROP.CODE ANN. § 93.006(c) (Vernon Supp.2010).

on the cost to repair the alleged damage to the leased property, not providing it with a credit in the judgment for its security deposit, awarding Max attorney's fees, and not awarding Lone Starr attorney's fees.

We affirm in part, reverse in part, and remand solely for a new trial on attorney's fees.

### Factual and Procedural Background

In May 1998, Lone Starr entered into a lease agreement with Championship Sports, Inc. to lease a property in Houston, Texas to be used as an "adult entertainment center," which included "movie exhibitions, sales, and videotape rentals." [2] The lease provided that the original term would expire December 31, 2001 and Lone Starr would become a month-to-month tenant after this time, pay a monthly rental fee of $8,200 until December 31, 1999, and pay a monthly rental fee of $8,600 for the remainder of the lease term and any additional period in which it remained in the property as a month-to-month tenant.

The lease imposed certain maintenance obligations on Lone Starr. Specifically, the lease provided,

> Throughout the term of this lease, [Lone Starr], at [Lone Starr's] own expense, agrees to keep the Premises and improvements thereon in good repair and condition, and will save and hold Lessor harmless from penalty or damage imposed by a lawful authority for the violation of any lawful regulation, and from any loss, damage, or expense in any way arising out of the use of said Premises by [Lone Starr]. Lone Starr further covenants and agrees that [it] will not commit or allow the commission of waste on the Premises, . . . . [Lone Starr] shall deliver the Premises free and clean of

trash and in good repair and condition at the expiration or termination of this Lease Agreement.

The lease also provided that, upon termination, Lone Starr would have twenty days to remove its property and improvements at its own expense, "so long as such removal is without damage to the structure or the Premises." Max applied, as a security deposit for the instant lease, a $5,000 security deposit that Lone Starr had deposited pursuant to a prior lease agreement.

The parties extended the lease, and, in 2005, Lone Starr became a month-to-month tenant. In June 2006, Max bought the property subject to the lease between Championship Sports and Lone Starr. On September 26, 2006, Lone Starr sent Max a written notice that it intended to vacate the property on October 31, 2006. And, on October 20, 2006, Lone Starr sent Max a second notice, informing Max that it would vacate the property by November 1, 2006 and, pursuant to the terms of the lease, it would have an additional twenty days to remove its property and improvements.

On November 1, 2006, Max sent Lone Starr a letter stating that Max would begin its inspection of the property. On or about November 14, 2006, John Cibik, on behalf of Max, inspected and took photographs of the property. On November 15, 2006, David Greenberg, Max's general partner, sent to Lone Starr an e-mail informing Lone Starr that it had left the property in "terrible condition with extensive damage" and requesting that Lone Starr clean and repair the property. Greenberg attached to his e-mail photographs from Cibik's visit to the property. On November 27, 2006, Greenberg sent to Lone Starr a letter stating that Lone Starr had left the property "in poor condition

---

**2.** At the time it executed this lease agreement, Lone Starr had, pursuant to a previous lease agreement, already occupied the property for ten years for the same purposes.

with needed repairs and maintenance." He demanded that Lone Starr perform the required repairs and maintenance, informed Lone Starr that if it did not repair the property Max would make the repairs at Lone Starr's expense with Lone Starr's security deposit, and noted that Max would hold Lone Starr responsible for any excess amount. Greenberg further warned Lone Starr that its continued delays in repairing the property were preventing Max from leasing the property, and he stated that Max would hold Lone Starr accountable for any damages incurred.

On December 11, 2006, Max sent to Lone Starr a letter, demanding that Lone Starr pay Max $56,008.20, representing $26,608.20 in costs for "repairs/damages" and $34,400 for three-month's rent from November 2006 to February 2007, less Lone Starr's $5,000 security deposit. Max attached to this letter a document entitled, "Commercial Construction Cost Schedule," in which Cibik itemized costs for repairs or work that Max contended Lone Starr was obligated to perform under the lease. On December 21, 2006, Lone Starr responded and sent Max a letter, denying the allegation that it had failed to surrender the property in good condition, asserting that Max had acted in bad faith by not returning its security deposit or providing it with a written description and itemized list of deductions for repairs, and demanding the return of its security deposit.

Max filed suit, alleging that Lone Starr had breached the lease by failing to return the property in "good condition" and seeking $56,008.20 in damages as set forth in its demand letter as well as its attorney's fees. Lone Starr filed an answer, generally denying Max's allegations and alleging that Max had unlawfully retained its security deposit to cover normal wear and tear and failed to provide Lone Starr with a written description and itemized list of any deductions from the deposit. Lone Starr contended, thus, that Max had forfeited its right to withhold the security deposit or bring suit for damages. Lone Starr also asserted that Max's breaches of the lease agreement precluded it from bringing suit.

At trial, both parties presented conflicting evidence concerning the condition of the property, the maintenance and repairs performed by Lone Starr during the lease and at the time it terminated the lease, the scope of repairs and cleaning, and the amount of costs necessary to return the property to "good condition" in compliance with the lease. The jury found that Lone Starr had failed to comply with the lease; three months was a "reasonable period of time in which" Lone Starr could have made "required repairs, if any, to bring the property into good condition and repair"; Max was entitled to recover $22,058.20 for its damages for the "reasonable and necessary cost to repair and put the lease space in good condition"[3]; $8,600 was the "fair market monthly rental value of the property" in November 2006 at the time Lone Starr terminated the lease; and Max had provided Lone Starr with a "written description and itemized list of all deductions" from Lone Starr's security deposit.[4] The jury also awarded Max $19,230.13 for its attorney's fees for trial, as well as its appellate attorney's fees. In

---

3. The trial court instructed the jury that it should "not add any amount for repairs that result from normal wear and tear during the lease" and that "normal wear and tear" means "deterioration that results from the intended use of the commercial premises, in-cluding breakage or malfunction due to age or deteriorated condition."

4. The trial court instructed the jury that a landlord "may not retain any portion of a security deposit to cover normal wear and tear."

its judgment, the trial court awarded Max damages in the amount of $47,858.20 and entered a take-nothing judgment against Lone Starr on its counterclaim.

## Breach of Contract

In its first issue, Lone Starr argues that the jury's findings that Lone Starr breached its lease agreement with Max and the breach damaged Max were, "to the extent that these questions called upon the jury to interpret the lease," immaterial because the "[c]onstruction of a written instrument is a question of law." Lone Starr further argues that the evidence is legally and factually insufficient to support the jury's findings that Lone Starr breached the lease and Max was entitled to recover $22,058.20 for its damages for the "reasonable and necessary cost to repair and put the lease space in good condition" because the lease did not make it an "insurer of the condition" of the property, or responsible for deterioration or "ordinary wear and tear," and Max offered no evidence of an estimate to repair the "actual" damage to the property in order to return the property to "good condition."

As a preliminary matter, we note that although Lone Starr has included a "materiality" argument in its first issue, it has not demonstrated that jury question number one, which asked whether Lone Starr had breached the lease, was immaterial. Question number one was material to Max's claim that Lone Starr breached the lease. Similarly, the challenged portion of jury question number three, which asked for the "reasonable and necessary cost to repair and to put the lease space in good condition," was material, as this was the central disputed matter at trial. Although Lone Starr argues that it could not, as a matter of law, be held responsible under the lease for "ordinary wear and tear," this matter is not disputed. In jury question number three, the trial court instructed the jury that, in calculating the amount to compensate Max to return the property to "good condition," it could not include amounts "for repairs that result from normal wear and tear." The trial court further instructed the jury that "normal wear and tear" meant "deterioration" from the intended use of the property, "including breakage or malfunction due to age or deteriorated condition." The language used by the trial court in the instructions accompanying jury question number three comports with Lone Starr's arguments made on appeal regarding the proper construction of the lease, and Max does not challenge these accompanying instructions.[5]

We also note that, during the charge conference, Lone Starr objected to jury question number one only on sufficiency grounds. In regard to jury question number three, although Lone Starr objected to the portion of the question concerning the monthly rental value of the property (discussed below) and asserted that the question presented "an improper frame of damages," Lone Starr did not plainly object to asking the jury to determine an amount of money necessary to put the property in good condition. We conclude that Lone Starr has failed to demonstrate that the challenged questions were immaterial, and we will consider the sufficiency of the evidence to support the jury's findings to questions one and three. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (assessing legal sufficiency of evidence according to instructions given by

---

5. Max did challenge these instructions at the charge conference in the trial court, but it does not challenge them on appeal.

trial court to jury when there is no objection to court's charge).

█ In conducting our legal-sufficiency review, we will sustain a legal sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005). We "must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id.* at 822. If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). " '[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.' " *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)). However, if the evidence at trial would enable reasonable and fair-minded jurors to differ in their conclusions, then jurors must be allowed to do so. *Keller,* 168 S.W.3d at 822; *see also King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003). "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Keller,* 168 S.W.3d at 822.

In conducting a factual-sufficiency review, we must consider, weigh, and examine all of the evidence that supports or contradicts the jury's determination. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989); *London v. London,* 192 S.W.3d 6, 14–15 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). We may set aside the verdict only if the evidence that supports the jury's finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Nip v. Checkpoint Sys., Inc.,* 154 S.W.3d 767, 769 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

In its brief, Lone Starr agrees that, at trial, it "did not contest that there was damage to the sheet rock, damage to the ceiling, and other minor damage to the building." Although Lone Starr has not directly conceded the sufficiency of the evidence to support the jury's finding that it breached the lease, Lone Starr's primary substantive challenge is to the sufficiency of the evidence to support the jury's findings as to the amount of repair costs necessary to return the property in good condition as required by the lease. Lone Starr complains that Max "never provided an estimate of the cost to repair" the sheet rock, ceiling damage, and other minor damage, but provided evidence only of the costs to perform the extensive work detailed in the schedule prepared by Cibik. Lone Starr asserts that this schedule did not represent the costs necessary to return the property in "good repair and condition," but represented the costs of a "major overhaul" of the property.

At trial, Max introduced a significant number of photographs into evidence depicting damage to the property, and it presented testimony that these photographs depicted the condition of the property after Lone Starr had vacated it. Also, William Becker, Lone Starr's general partner, testified that the lease obligated Lone Starr to maintain the property throughout the lease and to "clean the

696

premises and leave it in a presentable condition" or "good condition." He agreed that Lone Starr was obligated to maintain the property by painting it and fixing the air conditioner, electrical system, and plumbing system. When reviewing Max's photographs, Becker agreed that they reflected that the property was not in good condition, the storage area of the property needed to be cleaned, there was trash left in the property, the sheetrock had not been repaired, and there was glue remaining on the sheetrock from where plexiglass and a neon sign had been removed. Becker stated that Lone Starr left "any type of painting or tape or texture" to be done by the next tenant, and he asserted that many of the photographs depicted normal wear and tear and did not depict the way that Lone Starr had left the property. He testified that Lone Starr, in vacating the property, had swept the property, removed debris, and fixed a broken banister.

Cibik, Max's contractor, testified that a tenant leaving a property in good condition would need to repair sheetrock, clean floors, and make other repairs. When looking at Max's photographs, Cibik testified that they depicted a property that had not been returned in good condition, the floor was "soft in some areas" and was in "disarray," the flooring was not kept in good repair, the ceiling acoustic tiles were not in good repair, and the ceiling was "missing in many spots" and "rusted in other areas." It looked to Cibik as if "not a lot" of maintenance had been performed over the course of the 18–year lease. He noted that the plumbing system was not kept in good repair, the water cooler was either "nonexistent or nonfunctional," some duct work would have been necessary because it was "just in bad shape," there were electrical lines that were loose and would need to be capped, and an "electrician would have to come in and rerun the conduit to make it function prop-

erly." He also noted that there was some "patching and some tape and float" necessary for drywall repair, a "couple of the interior doors were splintered" or were not in good condition and needed to be replaced, there were door handles missing, and the tile on the bathroom walls "needed [to be] Cloroxed and cleaned and scraped and re-grouted." Moreover, a bathroom countertop was missing or cracked and needed to be replaced, and the interior walls and doors needed repainting. Cibik explained that there had been leaks "coming down" into the property on the masonry and cinderblocks, which resulted in stains, and the leaks indicated that Lone Starr had not provided adequate maintenance. Cibik specifically noted that there was water damage that had ruined a stud and appeared to cause mold. He explained that a tenant obligated to keep a property in good condition would be required to make "maintenance repairs" throughout the term of the lease, and he opined that Lone Starr had failed to keep the property in good condition and repair. Cibik noted that when he returned to the property in December 2006, the condition of the property looked "substantially similar" to the conditions depicted in Max's photographs.

David Greenberg, Max's general partner, testified that Max had given Lone Starr "every opportunity" to repair the property, but it had refused to do so, and the property was in "horrid condition." Greenberg denied Lone Starr's claim that the damage to the property could be attributed to normal wear and tear, and he asserted that the condition of the property was due, in part, to "neglect" and lack of maintenance, which he noted was the tenant's responsibility.

In regard to the amount of Max's damages, Cibik testified that his construc-

tion schedule represented the costs necessary to put the property in good condition as of December 2006. His schedule contained an itemized list of repairs with corresponding costs for each proposed repair. Lone Starr emphasizes that Cibik, during his testimony, stated that his schedule accounted for returning the property to "vanilla box" condition, which he explained is "simply four walls" so that "the next tenant would not really have to spend a lot of money." Lone Starr asserts that even Cibik agreed that many of the proposed repairs listed in his schedule were for damages caused by "general wear and tear."

Additionally, Lone Starr, citing Cibik's testimony, attacks the sufficiency of the evidence to support the necessity of each of the repair items and the corresponding dollar figures listed on the schedule for each of these items. For example, in regard to the cost for repairing the flooring and ceiling, Lone Starr notes that Cibik agreed that ceiling tiles "need to be replaced periodically." And Lone Starr asserts that Cibik provided no evidence of damage "more than the ordinary wear and tear [caused by] 18 years of occupancy." Lone Starr complains that the lease did not obligate it to demolish the floor and ceiling as indicated in Cibik's schedule. In regard to the cost for repairing the plumbing, also included in Cibik's schedule, Lone Starr complains that Cibik did not provide a clear explanation for the estimated costs, and it notes that even Cibik agreed that the pipes in the property exhibited general wear and tear.

Through its cross-examination of Cibik, Lone Starr obtained potentially conflicting testimony about the scope of repairs necessary to return the property to good condition. As noted above, Cibik agreed, in response to questions concerning several of the items in the schedule, that many of the proposed repairs were for damage that could have been caused by wear and tear. However, Cibik also testified that all of the repairs included in the construction schedule were necessary to return the property to good repair. On redirect examination, Cibik made some effort to clarify his "ordinary wear and tear testimony" by explaining that the damage to the property was attributable both to longstanding deferred maintenance and damage to the property at the time Lone Starr vacated it.

In regard to the sufficiency of the evidence to support the jury's award, Cibik stated that the amounts identified in his construction schedule represented the amount of costs necessary to return the property to good condition. And, although Lone Starr presented some conflicting testimony as to whether all of the repairs identified in the schedule were necessary due to damage caused by Lone Starr or were necessary in order to return the property to good condition, the testimony of Cibik, Greenberg, and Becker support an implied finding that Lone Starr caused the damages and such repairs were necessary to return the property to good condition. Moreover, to the extent that Lone Starr may have successfully attacked the sufficiency of the evidence to support certain portions of the construction schedule, the jury did not award the full amounts stated in the schedule, but rather $22,058.20, four thousand dollars less than the amount stated by Cibik.

We hold that the evidence is legally sufficient to support the jury's findings that Lone Starr breached the lease agreement and Max is entitled to recover $22,058.20 for the "reasonable and necessary cost to repair and put the lease space in good condition." *See Siegler v. Robinson,* 600 S.W.2d 382, 386 (Tex.Civ.App.-Houston [1st Dist.] 1980, writ ref'd n.r.e.) (stating that, in cases where there are no

permanent injuries to premises, "the landlord is entitled to the reasonable cost of repairs as the proper measure of damages if he waits until after the term of the lease has expired"). We further hold that the jury's findings that Lone Starr breached the lease and that Max is entitled to recover $22,058.20 for its damages are not so contrary to the overwhelming weight of the evidence so as to be clearly wrong or unjust and, thus, the evidence is factually sufficient support the jury's findings. *See id.* at 385 (holding that factually sufficient evidence supported jury finding that lessees "failed to return the premises in as good order and condition, natural deterioration and damages by the elements only excepted, as when they first took possession").

We overrule Lone Starr's first issue.

## Lost Rent

In its second issue, Lone Starr argues that the jury's findings did not support the trial court's award of $25,800 to Max for lost rent because "the trial court never asked the jury the controlling question of what amount of rent, if any, [Max] lost as a result of the breach of lease." Rather, Lone Starr asserts, the trial court submitted "two evidentiary questions that were arguably relevant to the question of lost rent" and "then assumed that, had the property been left in 'good' condition, [Max] would have immediately rented the property at $8,600" per month and was entitled to this amount of rent for a three-month period. Lone Starr contends that, if the questions pertaining to lost rent were "immaterial," we should render a take-nothing judgment on this portion or damages. Alternatively, Lone Starr argues that if the questions were "defective," we should remand the case for a new trial. Lone Starr further argues that the evidence is legally and factually insufficient to

support the "implied finding" that Max lost the amount of rent awarded by the trial court as a result of Lone Starr's breach of the lease.

The trial court apparently used the jury's answers to two questions to calculate what it determined to be an appropriate amount of lost rent attributable to Lone Starr's breach. First, in question number two, the trial court asked the jury to make a finding on the "reasonable period of time in which" Max could have made "the required repairs, if any, to bring the property into good condition and repair." Second, in a portion of question number three that was not predicated on any particular finding, the trial court asked the jury to determine the "fair market monthly rental value of the property in November 2006," which was the approximate date on which Lone Starr had terminated the lease and vacated the property.

Lone Starr objected to question number two on the ground that it did not concern "an ultimate issue in the case" and an answer to the question would not support a judgment for Max. Lone Starr further objected that the question did not "establish any elements of any cause of action," the issue "as framed submit[ted] an improper measure of damages," and the question was "vague, confusing, and misleading." Lone Starr objected to the "fair market monthly rental value" portion of question number three on the grounds that it submitted "an improper frame of damage," was "vague, confusing, and misleading," required the jury "to find damages on the fair monthly rental value of the property," and was "improperly included in this question." Lone Starr asserted that the matter of lost rent could be submitted "as a separate question." The trial court overruled Lone Starr's objections. The jury found, in response to question number two, that three months was a rea-

sonable period of time to make repairs and, in response to question number three, that $8,600 was the fair market monthly rental value of the property. The trial court, in its judgment, awarded Max $25,800 for lost rent, apparently multiplying the jury finding of the fair market monthly rental value and the jury finding on the number of months in which Max could have reasonably made the repairs to the property in order to calculate its award.

A trial court has wide discretion in submitting jury questions as well as instructions and definitions. *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 431 (Tex.App.-Houston [14th Dist.] 1998, pet. denied). This discretion is subject only to the requirement that the questions submitted must: (1) control the disposition of the case; (2) be raised by the pleadings and the evidence; and (3) properly submit the disputed issues for the jury's determination. Tex.R. Civ. P. 277, 278; *Moore v. Kitsmiller*, 201 S.W.3d 147, 153 (Tex.App.-Tyler 2006, pet. denied); *Lee–Wright, Inc. v. Hall*, 840 S.W.2d 572, 577 (Tex.App.-Houston [1st Dist.] 1992, no writ). The trial court's judgment will not be reversed for charge error unless the error was harmful, i.e., it probably caused the rendition of an improper verdict or probably prevented the petitioner from properly presenting the case to the appellate courts. Tex.R.App. P. 44.1; *see also Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex.2009). Charge error is generally considered harmful if it relates to a contested, critical issue. *Columbia Rio Grande Healthcare, L.P.*, 284 S.W.3d at 856. If a question submitted on a plaintiff's claim is "defective," the appropriate remedy is to remand for a new trial; however, if the question submitted is "immaterial," the appropriate remedy is to render judgment. *Ford Motor Co. v. Ledesma*,

242 S.W.3d 32, 44 (Tex.2007); *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 839–41 (Tex.2000).

Loss of rentals may constitute an appropriate measure of damages for the temporary loss of the use of land. *Z.A.O., Inc. v. Yarbrough Drive Center Joint Venture*, 50 S.W.3d 531, 546–47 (Tex. App.-El Paso 2001, no pet.). Here, neither question number two nor three asked the jury to determine the amount of lost rentals, if any, that Max was entitled to recover as a result of Lone Starr's breach. Question number two simply asked the jury to find a reasonable period of time in which Max could have made repairs to bring the property into good condition and repair. Question number three, which was the damages question, instructed the jury to consider "the following elements of damages, and none other," but then only listed reasonable and necessary repair costs as an element of damages. Although this question subsequently asked the jury to find "the fair market monthly rental value" of the property in November 2006, it in no way asked the jury to determine whether this amount, or any other amount, represented an amount of lost rentals that Max was entitled to recover as a result of Lone Starr's breach. We hold that the trial court abused its discretion in submitting to the jury question number two and the portion of question number three related to the fair market monthly rental value of the property because neither of these questions controlled the disposition of the case.

We further hold that question number two and the challenged portion of question number three were immaterial, rather than merely defective. The answers provided by the jury did not in any way support the trial court's award of damages to Max for its alleged lost rentals. As noted above, the jury was not

asked to consider whether Lone Starr's breach caused Max to sustain damages for lost rent. Because these questions were immaterial, rather than merely defective, the appropriate remedy is to render judgment that Max take nothing in its claim for damages for lost rentals. *See Stutzman,* 46 S.W.3d at 839–41.

We sustain Lone Starr's second issue.

### Lone Starr's Counterclaim

In its third issue, Lone Starr argues that it, as a matter of law, was entitled to relief on its counterclaim against Max because Max had failed to provide Lone Starr with a "written description and itemized list of all deductions" from Lone Starr's security deposit. *See* Tex. Prop. Code Ann. § 93.006 (Vernon 2007).

Section 93.006 provides,

(a) Before returning a security deposit, the landlord may deduct from the deposit damages and charges for which the tenant is legally liable under the lease or damages and charges that result from a breach of the lease.

(b) The landlord may not retain any portion of a security deposit to cover normal wear and tear. In this subsection, "normal wear and tear" means deterioration that results from the intended use of the commercial premises, including breakage or malfunction due to age or deteriorated condition, but the term does not include deterioration that results from negligence, carelessness, accident, or abuse of the premises, equipment, or chattels by the tenant or by a guest or invitee of the tenant.

(c) If the landlord retains all or part of a security deposit under this section, the landlord shall give to the tenant the balance of the security deposit, if any, together with a written description and itemized list of all deductions.

The landlord is not required to give the tenant a description and itemized list of deductions if:

(1) the tenant owes rent when the tenant surrenders possession of the premises; and

(2) no controversy exists concerning the amount of rent owed.

*Id.*

Texas Property Code section 93.011 provides,

(a) A landlord who in bad faith retains a security deposit in violation of this chapter is liable for an amount equal to the sum of $100, three times the portion of the deposit wrongfully withheld, and the tenant's reasonable attorney's fees incurred in a suit to recover the deposit after the period prescribed for returning the deposit expires.

(b) A landlord who in bad faith does not provide a written description and itemized list of damages and charges in violation of this chapter:

(1) forfeits the right to withhold any portion of the security deposit or to bring suit against the tenant for damages to the premises; and

(2) is liable for the tenant's reasonable attorney's fees in a suit to recover the deposit.

(c) In a suit brought by a tenant under this chapter, the landlord has the burden of proving that the retention of any portion of the security deposit was reasonable.

(d) A landlord who fails to return a security deposit or to provide a written description and itemized list of deductions on or before the 60th day after the date the tenant surrenders posses-

sion is presumed to have acted in bad faith.

*Id.* § 93.011 (Vernon 2007).

The evidence supports a finding that Lone Starr vacated the property in mid-November 2006 and did not return to the property or make further repairs. On November 14, 2006, Cibik inspected the property and photographed the damage to it. Several witnesses testified that this damage exceeded normal wear and tear. On November 15, 2006, David Greenberg, Max's general partner, sent to Lone Starr an e-mail informing Lone Starr that it had left the property in "terrible condition with extensive damage." Greenberg attached to the e-mail several photographs of the damage and instructed Lone Starr to clean and repair the property to avoid violating the lease. On November 27, 2006, he sent to Lone Starr a letter, stating that Lone Starr had left the property "in poor condition with needed repairs and maintenance," demanding that Lone Starr repair the property and return it in good condition, and noting that Max would retain the security deposit if Lone Starr did not comply. On December 11, 2006, Max sent to Lone Starr a letter with an attached "cost/bid for the repairs/damages," identifying $26,608.20 in "repairs/damages" and setting forth an itemized list of repairs.

Lone Starr asserts that, "as a matter of law," the construction schedule is not sufficiently detailed and "[m]erely naming a thing does not describe it." Lone Starr also cites Greenberg's testimony in which he refused to acknowledge that a landlord has a duty to "itemize and specify to tenant the damages to the property." However, viewing the evidence in the light most favorable to the verdict, we conclude that the jury could have reasonably found that the schedule provided by Max sufficiently described each item within the property that was not in "good condition"

and the photographs attached to the original e-mail provided further detail. Lone Starr did not agree with Max that the items listed in the schedule were in poor condition, and it asserted that many of the photographs depicted only "normal wear and tear." However, the jury could have reasonably found that Max, by providing the written and itemized schedule, furnished the necessary information in compliance with section 93.006(c). Accordingly, we hold that the evidence is legally sufficient to support the jury's finding that Max did provide Lone Starr with a written description and itemized list explaining why Max had retained Lone Starr's security deposit. *See id.* Because legally sufficient evidence supports the jury's finding, no presumption of bad faith arose under the Property Code. *See id.* § 93.011.

To the extent that Lone Starr suggests in its appellate briefing that it was entitled to the recovery of damages under the Texas Property Code, we note that Lone Starr, at trial, affirmatively represented to the trial court that it was not seeking damages. Instead, Lone Starr only argued that Max had forfeited its right to withhold any portion of the security deposit or to bring suit against it for damages to the premises. *See id.* § 93.011(b).

We overrule Lone Starr's fourth issue.

**Admission of Testimony**

█ In its fourth issue, Lone Starr argues that the trial court erred in not admitting into evidence the testimony of William Becker, Lone Starr's general partner, on the cost to repair the alleged damage to the property because this was Lone Starr's "only evidence" on the matter and, "[o]nce the jury determined that Lone Starr breached the lease, [it] had nothing except Cibik's testimony from which to assess cost of repair."

We review a trial court's admission or exclusion of evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex.2005). To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was in error and the error (1) probably caused the rendition of an improper judgment or (2) probably prevented the appellant from properly presenting the case to the court of appeals. Tex.R.App. P. 44.1; *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex.2001). In determining if the excluded evidence probably resulted in the rendition of an improper judgment, we review the entire record, and, "[t]ypically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted." *Interstate Northborough P'ship*, 66 S.W.3d at 220. Ordinarily, we will not reverse a judgment because a trial court erroneously excluded evidence when the evidence in question is cumulative and not controlling on a material issue dispositive to the case. *Id.*

At trial, Lone Starr attempted to elicit testimony from Becker regarding his opinion of the condition of the property and the repair costs during the following exchange:

[Lone Starr's counsel]: You've looked at all these pictures?

[Becker]: Yes, sir.

[Lone Starr's counsel]: You've seen the sheetrock?

[Becker]: Yes, sir.

[Lone Starr's counsel]: What's your opinion of the sheetrock?

[Max's counsel]: Objection, Your Honor. If we're going to go into costs or things like that—

[Trial court]: Sustained in so far as—

[Max's counsel]: He hasn't been designated as an expert or his testimony disclosed in this regard.

[Lone Starr's counsel]: Well, this is his own property. I mean, he was—

[Trial court]: Did you designate him?

[Lone Starr's counsel]: As an expert?

. . . .

[Trial court]: No expert testimony if he wasn't designated, counsel.

[Lone Starr's counsel]: Well, I'm offering him, Your Honor, just as his understanding of the damages to the property and what it would take to put it in good repair.

[Trial court]: Nope.

Lone Starr subsequently made the following offer of proof:

[Lone Starr's counsel]: And—okay. What Mr. Becker is going to testify to is the fact that the water cooler would have been repaired at an approximate cost of $300, that to have repainted the portions of the premises that needed painting would have cost about $1,500, that the other repairs probably could have been effectuated for, in the neighborhood of a couple thousand dollars, but that the $5,000 dollar security deposit would have covered all the cost of repairs to have put the property in good repair and condition based upon his observation of the property and the photos and evidence presented in this case.

Max responded that Lone Starr, in its responses to the request for disclosure, represented that Becker was "a principal of the defendant, not an owner," and neither Lone Starr's disclosure nor "any of the pleadings make reference to any sort of offset that [Lone Starr] would be providing with specific amounts of damages for each of the items that Mr. Becker allegedly was going to testify to." Max

also complained that any "offsets" would have to have been calculated and provided to it in the disclosures. On appeal, Max further complains that Becker was called to testify at trial as the general partner of an adult video store, "not as a construction expert with knowledge of damages to the premises and the cost to put it in good repair." Max also asserts that Lone Starr failed to establish that Becker had "any familiarity or personal knowledge of the damage or cost of repairs," Lone Starr did not even designate Becker as a lay witness with knowledge regarding the costs to repair," and the bill of exception "fails to establish what personal knowledge, if any, formed the basis of" Becker's testimony.

 There are two types of offers to preserve error: the offer of proof (formerly referred to as an informal bill of exception) and the formal bill of exception. *Fletcher v. Minnesota Min. and Mfg. Co.*, 57 S.W.3d 602, 606 (Tex.App.-Houston [1st Dist.] 2001, pet. denied); *see* TEX.R. EVID. 103; TEX.R.APP. P. 33.2. To challenge the exclusion of evidence by a trial court on appeal, a complaining party must present the excluded evidence to the trial court by offer of proof. *Fletcher*, 57 S.W.3d at 606. The primary purpose of the offer of proof is to enable the reviewing court to determine whether the exclusion was erroneous and, if so, whether it was harmful. *Id.* at 608. Therefore, an offer of proof must be specific enough that the reviewing court can determine admissibility. *See* TEX.R. EVID. 103(a)(2); *In the Interest of N.R.C.*, 94 S.W.3d 799, 806 (Tex.App.-Houston [14th Dist.] 2002, pet. denied).

Here, during the initial exchange, Lone Starr's counsel explained that he sought to elicit from Becker testimony regarding the damage to the property and "what it would take to put it in good repair," i.e., the costs to comply with the lease. Max's counsel objected, noting that Lone Starr had not designated Becker as an expert in this regard nor disclosed that these matters fell within the scope of his testimony. It is undisputed that Becker was not designated as an expert. During the offer of proof, Lone Starr's counsel represented that Becker would have testified to the repair cost for the water cooler, the painting costs, and the overall cost for the other repairs in order to return the property to good repair and condition, but Lone Starr's counsel provided no explanation as to the basis for any such opinions or whether Becker had personal knowledge on the cost of the actual damages or repairs.

Although a lay witness with personal knowledge may be qualified to testify regarding the costs of repair, here, there is nothing in the bill of exception that would have indicated to the trial court that Becker had personal knowledge of the specific costs to repair the water cooler, paint the interior of the property, and complete other needed repairs. *See SAS & Assocs., Inc. v. Home Mktg. Servicing, Inc.*, 168 S.W.3d 296, 302 (Tex.App.-Dallas 2005, pet. denied) (holding trial court did not err in admitting lay witness testimony on value of property and costs of repair from witness who testified that he investigated costs and obtained bids); *Coker v. Burghardt*, 833 S.W.2d 306, 310–11 (Tex.App.-Dallas 1992, writ denied) (holding that trial court did not abuse discretion in admitting testimony of car owner on reasonable cost of repairs when car owner testified that he had familiarized himself with cost of repairs by visiting area car repair shops).

In its bill, Lone Starr did not present any specific information indicating that Becker had any basis for his opinions on the costs to repair the property, either as an expert or a lay witness. Much of Becker's testimony indicates that, although he was presented as Lone Starr's corporate

representative at trial, he had very little involvement with the property. In response to Max's questioning, Becker, on multiple occasions, disclaimed personal knowledge of matters pertaining to the property. He noted that he had worked out of Dallas and had not personally participated in the repairs at the facility. He, in response to a question about whether Lone Starr personnel had returned to the property in November 2006 to effectuate repairs, also stated that he "was not present" and did not "know what Lone Starr facilities managers on site here in Houston did." He agreed on several occasions that he did not have "personal knowledge" about the work done by Lone Starr at the property. Based upon the record before us, we hold that the trial court did not abuse its discretion in excluding Becker's challenged testimony.

We overrule Lone Starr's fourth issue.

### Security Deposit

■ In its fifth issue, Lone Starr argues that the trial court erred in not providing it with a credit in the judgment for the $5,000 security deposit it had paid to Max because Max did not dispute that Lone Starr had paid it this amount and Max retained the deposit.

■ The right to an offset is an affirmative defense, and the burden of pleading offset and of proving facts necessary to support it are on the party making the assertion. *SAS & Assocs., Inc.,* 168 S.W.3d at 301; TEX.R. CIV. P. 94. Lone Starr has waived this issue because it did not plead the affirmative defense of offset, nor did it make any objections to the jury charge regarding this matter. *Columbia Med. Ctr. of Las Colinas v. Bush ex rel. Bush,* 122 S.W.3d 835, 862 (Tex.App.-Fort Worth 2003, pet. denied). It is also not clear, based upon the record before us, as to whether the jury may have considered the deposit in its findings. In sum, Lone Starr did not raise any timely objection on the issue of its security deposit. TEX. R.APP. P. 33.1. Accordingly, we hold that the trial court did not err in not including an offset in its judgment.

We overrule Lone Starr's fifth issue.

### Attorney's Fees

■ In its sixth issue, Lone Starr argues that the trial court erred in awarding Max attorney's fees because the underlying judgment should be reversed or, alternatively, that a reduction in the amount of damages awarded requires a retrial of the attorney's fees claim. Lone Starr also argues that the trial court erred in not awarding it attorney's fees because, if successful on appeal, it would be entitled to its attorney's fees both under the Texas Property Code and the lease.

In its judgment, the trial court awarded Max damages in the amount of $47,858.20 and entered a take-nothing judgment against Lone Starr on its counterclaims. The damages awarded to Max consisted of $22,058.20 for the "reasonable and necessary cost to repair and put the lease space in good condition" and another $25,800 for lost rent, which the trial court calculated by multiplying the jury finding of the fair market monthly rental value and the jury finding on the number of months in which Max could have reasonably made the repairs to the property. As explained above, we are affirming the portion of the judgment awarding damages for repair costs, but we are reversing the portion of the judgment awarding damages for lost rent. We are also rendering judgment that Max recover nothing on its claim for lost-rent damages.

An award of attorney's fees must be supported by evidence that the fees were both reasonable and necessary. *Powell*

*Elec. Sys., Inc. v. Hewlett Packard Co.,* 356 S.W.3d 113, 127 (Tex.App.-Houston [1st Dist.] 2011, no pet.). "Generally, the determination of reasonable attorney's fees is a question of fact and the testimony of an interested witness, such as a party to the suit, though not contradicted, does no more than raise a fact issue to be determined by the jury." *Garcia v. Gomez,* 319 S.W.3d 638, 642 (Tex.2010). The trier of fact can consider the amount in controversy, the time and effort required, and the expertise of counsel in arriving at a reasonable amount of attorney's fees. *Powell Elec. Sys., Inc.,* 356 S.W.3d at 128. Here, we are reducing the damages awarded in the trial court's judgment to Max by over 50%. When an amount of damages is meaningfully reduced, the issue of attorney's fees should ordinarily be retried unless we are "reasonably certain that the jury was not significantly influenced" by the erroneous damage award. *Young v. Qualls,* 223 S.W.3d 312, 314–15 (Tex.2007); *Bossier Chrysler–Dodge II, Inc. v. Rauschenberg,* 238 S.W.3d 376, 376 (Tex.2007); *Barker v. Eckman,* 213 S.W.3d 306, 314 (Tex.2006); *Powell Elec. Sys., Inc.,* 356 S.W.3d at 128.

We recognize that this case is distinguishable from those cited above in that, although we are reducing the actual damages awarded by the trial court in its judgment, the jury was not specifically asked to award the amount of lost-rent damages that we are reversing. Nevertheless, because of the structure of the charge, and the evidence presented at trial concerning lost rent, we cannot be reasonably certain that the jury was not affected by the issue of alleged damages for lost rent. Even though there were no material questions ultimately submitted on the ele-

ment of lost rent, the parties certainly discussed this matter at trial and the jury made findings on the fair market value of rent. Accordingly, the case must be remanded to the trial court for a new trial on attorney's fees. *See Bossier Chrysler–Dodge II, Inc.,* 238 S.W.3d at 376.[6]

We sustain the portion of Lone Starr's sixth issue in which it argues that a reduction in the amount of damages awarded to Max requires a retrial of the attorney's fees claim. We overrule the remaining portions of Lone Starr's sixth issue.

Having overruled all of Lone Starr's issues in regard to its cross claim, we hold that the trial court did not err in awarding attorney's fees to Max and in not awarding attorney's fees to Lone Starr.

### Conclusion

We reverse the portion of the trial court's judgment awarding Max damages for lost rent. We also reverse the portion of the judgment awarding Max its attorney's fees, and we remand the case for a new trial solely on the issue of attorney's fees. We affirm the remaining portions of the trial court's judgment.

---

**6.** We do not suggest, upon remand, that Max will not be permitted to seek an amount of attorney's fees consistent with the amount it sought in the trial court and awarded by the jury.