**Opinion issued December 3, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00518-CR

————————————

**WILLIAM TRAVIS KITCHENS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 178th District Court**
**Harris County, Texas**
**Trial Court Case No. 1502983**

## MEMORANDUM OPINION

Rejecting appellant William Kitchens's self-defense claim, a Harris County jury found Kitchens guilty of murder and assessed punishment at fifteen years in prison. Kitchens appeals, asserting five issues. We affirm the jury's guilt finding but reverse for a new punishment hearing.

## Background

A Harris County grand jury indicted Kitchens for murder in the March 7, 2016 shooting death of Hipolito Desoto. On that morning, 44-year-old Desoto rode his motorcycle to Kitchens's auto-repair shop, IDB Racing, which did repair, maintenance, and restoration services on high-end, exotic, and European cars. IDB Racing was located on FM 1960 West in Houston, an area Harris County Sheriff's Office (HCSO) Detective Chris Cooke described as a high-crime area that gets "hit for burglary a lot." There were bullet holes in the shop's bay doors when Kitchens rented the shop.

IDB Racing's premises consisted of a three-bay garage area with a small office. Retired HCSO Chief Deputy Michael Smith, who testified as a self-defense expert for Kitchens, described the office as cramped; it measured seventeen feet and ten inches from the glass entry door to the wall behind Kitchens's desk, with the front of Kitchens's desk being twelve feet from the entry door, a distance that Smith stated a person could cover in eight-tenths of a second.

Directly across the parking lot from IDB Racing was a machine shop with a sign indicating that it was a machine shop. IDB Racing did not have any signage suggesting it could be confused with a machine shop; its signage indicated that it was an automotive repair facility.

When he saw Desoto ride up on his motorcycle shortly before 10:00 a.m., Kitchens, who was age twenty-nine, five feet and seven inches tall, and 160 pounds at the time, opened his desk drawer to make sure his pistol was available. Kitchens had never met Desoto, who was five feet and seven inches tall and 280 pounds. Desoto entered IDB Racing's office and began talking with Kitchens. The entire incident was recorded on IDB Racing's surveillance video, which did not record audio.

Kitchens described Desoto's demeanor as "irritated," with a tone of voice that "wasn't such that I would expect somebody who was coming into a business unannounced looking for somebody to be like." Desoto asked for the whereabouts of the "long-haired hippy machinist."[1] Kitchens testified that Desoto's tone and demeanor caused him to become "very uneasy."

According to Kitchens, when he advised Desoto that no one fitting that description worked at IDB Racing, Desoto became angrier, began violently moving his hands around, and told Kitchens that he "didn't fucking get it." Kitchens said that he asked Desoto if the person he was describing used to work at

[1] Jose Hernandez, who was Desoto's co-worker at Advance Cycles, a motorcycle shop a few miles from IDB racing, testified that, on the morning of the shooting, Desoto had left work to find a machinist to do machine work on a motorcycle "wheel spacer." Hernandez explained that, a few months before, a machinist who was "kind of like a hippy," with "long straggly hair," had visited them at Advance Cycles and asked them questions about building a motorcycle. The machinist told Hernandez and Desoto the approximate location of his machine shop.

3

IDB Racing or perhaps at another shop in the area, but Desoto "seemed to be getting more and more angry that I couldn't tell him where this guy he was looking for was." Kitchens testified that he was terrified and that he "didn't know what to tell him to help him." Chad Finch, an IDB Racing employee and a good friend of Kitchens, testified that he saw Desoto pull up on his motorcycle and come into the office, after which Finch heard Desoto, but not Kitchens, yelling.

Kitchens testified that he "expressed to [Desoto] that if he wasn't able to give any more information about the person that he was looking for, then he needed to leave" the premises. According to Kitchens, Desoto again told him that he "didn't fucking get it," threw his hands at Kitchens as if to push away, and began moving towards the front door. Kitchens said that, as Desoto was opening the door, apparently to leave, he said to Kitchens, "shit like this is why we will be back to beat your ass."

Kitchens testified that he responded to Desoto's threat to "come back and beat [Kitchens's] ass" by responding back "the same thing he said, out of disbelief." Kitchens said that Desoto then pulled the door closed, took the ear buds out of his ears, turned as if to enter back into the office, and "yelled that he was actually going to fuck me up right now." Desoto was unarmed during the entire incident and had his hands by his side when he made this final comment to Kitchens.

4

Kitchens thought he was about to be beaten to death by Desoto because "it would be nothing" for the 100-plus pounds bigger Desoto to "beat [Kitchens] to a pulp and not even blink." Kitchens drew his pistol from his desk drawer, stepped towards Desoto, and shot Desoto, who fell to the floor. Asked by his attorney why he shot Desoto, Kitchens responded, "I thought he was going to kill me." When asked why he thought that, Kitchens said, "Because there was this large stranger in my office that thought I was hiding somebody from him[, and] that was looking for somebody that he seemed angry about." Kitchens added that he felt he had no other choice but to shoot Desoto.

As Kitchens walked forward to leave the office toward the hall entry to the bays, Desoto started to push himself up and looked at Kitchens. Kitchens testified that he thought Desoto "was about to get up off the ground and beat me to death" and that he fired additional shots at Desoto. One of the shots struck Desoto just above the right eye. Kitchens shot Desoto a total of five times. Desoto died as the result of gunshot wounds to the head, chest, and back.

The above events transpired over the course of approximately two minutes, and the video confirms the movements and actions of Kitchens and Desoto as described by Kitchens at trial.

After shooting Desoto, Kitchens called 9-1-1, stated that a shooting had occurred and requested police and an ambulance, but he did not answer additional

5

questions and hung up. After calling 9-1-1, Kitchens next called Texas Law Shield, a program he had joined, to speak to an attorney. The 9-1-1 operator called IDB Racing back, and one of Kitchens's employees talked to the operator. Deputy Constable Jennifer Martinez was dispatched at 9:58 a.m. and arrived at IDB Racing at 10:04 a.m. Upon arrival, she handcuffed Kitchens, bagged his hands for gunshot residue testing, and put him in the back seat of her patrol vehicle.

HCSO Homicide Detective Cooke was notified of the shooting around 10:30 a.m. and responded sometime after 11:00. Cooke stated that when he arrived and first saw Kitchens, he observed that Kitchens was distraught, crying, and "visibly upset." Kitchens had been in the back of Martinez's patrol car for an hour to an hour and a half before Cooke talked to Kitchens the first time. Cooke testified that Kitchens was cooperative and gave him two statements—a brief one before Kitchens spoke with two attorneys, who had arrived in person after Kitchens's call to Texas Law Shield, and a second interview after Kitchens had spoken with his attorneys and conducted with Kitchens's attorneys present. After that, Cooke released Kitchens to go home, and another officer with video expertise later arrived to assist Cooke in viewing the surveillance video of the shooting. Cooke testified that, after viewing the video, he was shocked because of Desoto's lack of observable aggression and was of the opinion that the video was not consistent with the information he had received from Kitchens. Cooke further opined that the

6

size difference between Kitchens and Desoto did not change his investigation because he did not see anything aggressive on Desoto's part.

After being qualified as an expert to testify on the use of deadly force, retired HCSO Chief Deputy Michael Smith testified on behalf of Kitchens. After having been a licensed Texas peace officer for over forty years and having testified multiple times as an expert witness, this was Smith's first time to testify for the defense.

Smith testified that, when a person believes that something is about to happen that puts him or her in fear of his or her life or fear of being severely injured, a person is allowed to use deadly force to defend against apparent danger, even if that person turns out to be incorrect. Smith further testified that deadly force could be used appropriately when there exists "some type of aggressive movement to make the other person believe that they were about to be assaulted, either with a weapon, without a weapon that may not be apparent, or just with their body parts. Any part of the body can be used as a weapon." Smith also said that a person who has been shot "absolutely" can continue to pose a threat.

Smith testified that, based on Desoto's body language in the video, and assuming that Desoto had verbally threatened Kitchens as Kitchens had testified, Kitchens was justified in shooting Desoto. Smith concluded that, under the facts, Kitchens was in fear and was entitled to use deadly force against the perceived use

7

of deadly force by Desoto, a person who was more than 100 pounds bigger than Kitchens.

The jury was instructed in the charge on the law of self-defense and the use of deadly force but found Kitchens guilty of murder.

## Sufficiency of the Evidence

In his first issue, Kitchens contends that the evidence is insufficient to support the jury's determination that he did not act in self-defense.

### Self-Defense with Deadly Force

If the issue of the existence of a defense is submitted to the jury, the court must charge the jury that a reasonable doubt on the issue requires that the defendant be acquitted. TEX. PENAL CODE. § 2.03(d); *Winkley v. State*, 123 S.W.3d 707, 712 (Tex. App.—Austin 2004, no pet.). In other words, the trier of fact must find against the defendant on the defensive issue beyond a reasonable doubt. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

Deadly force used in self-defense is a defense to a murder prosecution if the use of deadly force is justified under Penal Code Chapter 9. *See* TEX. PENAL CODE § 9.02, 9.31–.33; *Braughton v. State*, 569 S.W.3d 592, 606 (Tex. Crim. App. 2018). Subject to certain inapplicable exceptions, a person is justified in using force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or

8

attempted use of unlawful force." TEX. PENAL CODE § 9.31(a). The use of force, however, is *not* justified in response to verbal provocation alone. *Id.* § 9.31(b)(1).

Deadly force "means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3). A person is justified in using deadly force if he would be justified in using force under section 9.31 and "when and to the degree the actor reasonably believes the deadly force is immediately necessary: . . . to protect the actor against the other's use or attempted use of unlawful deadly force . . . ." *Id.* §9.32(a). A "reasonable belief" is one "that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42).

**Standard of Review**

In reviewing the sufficiency of the evidence, we view all evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements beyond a reasonable doubt. *Braughton*, 569 S.W.3d at 608. Just last year in *Braughton*, the Court of Criminal Appeals expounded on the appellate standard of review of a jury's rejection of self-defense with deadly force in a murder prosecution, stating that the above "familiar standard 'recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence.' " *Id.* (quoting *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)). The court

9

continued (and we quote it at length because of its applicability to Kitchens's first issue):

"On review, this Court determines whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all the evidence." *Id*.; *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012). We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *Brooks*, 323 S.W.3d at 922; *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *see Brooks*, 323 S.W.3d at 899 (a reviewing court must not sit as "thirteenth juror"; disagree with the jury's "weighing of the evidence"; or "disagree with a jury's resolution of conflicting evidence"). A reviewing court is thus "required to defer to the jury's credibility and weight determinations." *Brooks*, 323 S.W.3d at 899; *see also Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) (reviewing court must not usurp the jury's role by "substituting its own judgment for that of the jury"). "Although the parties may disagree about the logical inferences that flow from undisputed facts, '[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.' " *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (quoting *Anderson v. City of Bessemer*, [470 U.S. 564, 574 (1985)]). However, juries are not permitted to come to conclusions based on "mere speculation or factually unsupported inferences or presumptions." *Hooper*, 214 S.W.3d at 15–16 (explaining that speculation is "theorizing or guessing about the possible meaning of facts and evidence presented").

[I]n a claim of self-defense or defense of third persons that would justify a defendant's use of force against another, the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991). The defendant's burden of production requires him to adduce some

10

evidence that would support a rational finding in his favor on the defensive issue. *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013). By contrast, the State's burden of persuasion "is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Zuliani*, 97 S.W.3d at 594 (citing *Saxton*, 804 S.W.2d at 913). Thus, "[i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton*, 804 S.W.2d at 914.

   In *Saxton*, we explained that the issue of self-defense is an issue of fact to be determined by the jury, and that "[a] jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory." *Id.* at 914. In view of the general sufficiency principles described above, we stated, "Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Id.* We reaffirm these principles from *Saxton*, in conjunction with the general sufficiency principles described above, as providing the proper framework for evaluating a claim of insufficient evidence in this context. *See id.*

*Braughton*, 569 S.W.3d at 608–09.

Kitchens's principal argument is that the State did not present any evidence that would support the jury's rejection of his claim that he acted in self-defense and that he presented "more than ample" evidence that he acted in self-defense. Regarding Kitchens's argument that the "State offered nothing to substantially contradict [his] version of the event" and his "obvious fear" of the "much larger

11

and aggressive" Desoto, who was allegedly threatening Kitchens, the State correctly responds that it was not required to present evidence that disproved Kitchens's self-defense claim. As we noted above, the State's burden of persuasion in response to a defendant's claim of self-defense "is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Braughton*, 569 S.W.3d at 608–09 (quoting *Zuliani*, 97 S.W.3d at 594).

Kitchens next points to his self-defense evidence: his testimony about Desoto's alleged threats; his expert's testimony that the shooting was justified, assuming Desoto made the alleged threats; Desoto's body language on the video; and Kitchens's distraught behavior after the shooting. The State counters that, in any event, it did present evidence refuting Kitchens's self-defense claim—the video of the incident showing that Desoto did not use or attempt to use deadly force against Kitchens. And with respect to Kitchens's testimony that Desoto threatened him, the State responds that the use of force is not justified in response to verbal provocation alone. *See* TEX. PENAL CODE § 9.31(b)(1). Moreover—and given that the jury was able to observe Desoto's conduct and the shooting on the video—the jury was free to disbelieve Kitchens's testimony that Desoto had threatened him with death or serious bodily injury and Kitchens's contention that his belief that the unarmed Desoto was going to kill him was reasonable. *See*

12

*Saxton*, 804 S.W.2d at 913–14 (assessment of credibility of defensive evidence is "solely within the jury's province and the jury is free to accept or reject the defensive evidence"). In this case, the jury was free to reject Kitchens's self-defense testimony. *See Braughton*, 569 S.W.3d at 611–13; *Chambers v. State,* 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) ("As factfinder, the jury is entitled to judge the credibility of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties.").

As an appellate court, we cannot substitute our view of Kitchens's credibility based on a cold record for that of the jury, and we may not act as a "thirteenth juror" and overturn a jury verdict simply because we disagree with it. *Braughton v. State*, 522 S.W.3d 714, 734–35 (Tex. App.—Houston [1st Dist.] 2017), *aff'd*, 569 S.W.3d 592 (Tex. Crim. App. 2018). Therefore, we hold that a rational jury could have found that it was not reasonable for Kitchens to believe that the use of deadly force was immediately necessary. *See Bumguardner v. State*, 963 S.W.2d 171, 174 (Tex. Crim. App. 1998). We overrule issue one.

### Lesser-Included Offenses

In his second issue, Kitchens asserts that the trial court erred in refusing his request to instruct the jury on the lesser-included offenses of manslaughter, criminally negligent homicide, and deadly conduct. When reviewing alleged charge error, we first determine whether error exists and then, if so, ascertain whether the

resulting harm is sufficient to warrant a reversal. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015).

We follow a two-step test in determining whether a trial court is required to give a requested instruction on a lesser-included offense. *Bullock v. State*, 509 S.W.3d 921, 924 (Tex. Crim. App. 2016). The first step is to determine whether the requested instruction pertains to an offense that is a lesser-included offense of the charged offense, which is a matter of law. *Id.* Under this step, an offense is a lesser-included offense if it is within the proof necessary to establish the offense charged. *Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011). The second step is to ask whether there is evidence in the record that supports giving the instruction to the jury. *Id.* Under this step, a defendant is entitled to an instruction on a lesser-included offense when there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense. *Rice v. State*, 333 S.W.3d 140, 145 (Tex. Crim. App. 2011). The evidence must establish the lesser-included offense as a valid, rational alternative to the charge offense. *Id.* (citing *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007)).

**Manslaughter and Criminally Negligent Homicide**

Because manslaughter has the same elements as murder but requires the State to prove that a defendant acted "recklessly" rather than "intentionally or knowingly," it is a lesser-included offense of murder. *See McKinney v. State*, 207 S.W.3d 366, 370 (Tex. Crim. App. 2006); *Gahagan v. State*, 242 S.W.3d 80, 89 (Tex. App.—Houston [1st Dist.] 2007, pet ref'd); *see also* TEX. PENAL CODE § 19.04(a) (providing elements of manslaughter).

Criminally negligent homicide is also a lesser-included offense of murder because the only difference between the two crimes is the culpable mental state. *Thomas v. State*, 699 S.W.2d 845, 847 (Tex. Crim. App. 1985). A person commits criminally negligent homicide if he causes the death of an individual by criminal negligence. TEX. PENAL CODE § 19.05(a).

Kitchens admitted to intentionally shooting Desoto but in self-defense, and the video indisputably depicts Kitchens intentionally shooting Desoto. This court recently noted that a self-defense argument is inconsistent with the submission of manslaughter as a lesser-included offense in a murder case:

> Texas courts have concluded that the justification of self-defense is inconsistent with a claim that the defendant acted only recklessly. *See, e.g., Martinez v. State*, 16 S.W.3d 845, 848 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (holding that "one cannot accidentally or recklessly act in self-defense"); *Avila v. State*, 954 S.W.2d 830, 843 (Tex. App.—El Paso 1997, pet. ref'd) (holding defendant's testimony he acted in self-defense precluded instruction on reckless discharge of weapon); *Johnson v. State*, 915 S.W.2d 653, 659 (Tex. App.— Houston [14th Dist.] 1996, pet. ref'd) (stating that people "cannot

15

accidentally or recklessly act in self-defense"); *Mock v. State*, 848 S.W.2d 215, 219 (Tex. App.—El Paso 1992, pet. ref'd) (same).

*Murray v. State*, No. 01-17-00437-CR, 2018 WL 3849076, at *9 (Tex. App.—Houston [1st Dist.] Aug. 14, 2018, pet. ref'd) (mem. op., not designated for publication).

Similarly, a self-defense claim precludes the submission of criminally negligent homicide as a lesser-included offense. *See Johnson v. State*, 915 S.W.2d 653, 659–60 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) (holding that trial court properly refused to give instructions on lesser-included offenses involving elements of recklessness and criminal negligence where defendant testified he acted in self-defense); *see also Martinez v. State*, 16 S.W.3d 845, 848 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating "one cannot accidently or recklessly act in self-defense"); *Shannon v. State*, No. 08-13-00320-CR, 2015 WL 6394922, at *11 (Tex. App.—El Paso Oct. 21, 2015, no pet.) (not designated for publication) (concluding "that by affirmatively raising the issue of self-defense at trial, Appellant impliedly admitted that he acted intentionally in causing the victim's death, and was thereby precluded from receiving an instruction on the lesser-included offenses of manslaughter and criminally negligent homicide").

For these reasons, the trial court did not err in refusing to submit the lesser-included offenses of manslaughter and criminally negligent homicide.

**Deadly Conduct**

16

Deadly conduct by recklessly or knowingly discharging a firearm in the direction of an individual is a lesser-included offense of intentional murder by means of discharging a firearm. *Ortiz v. State*, 144 S.W.3d 225, 233–34 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd); *see* TEX. PENAL CODE § 22.05. To be entitled to an instruction on the lesser-included offense of felony deadly conduct, a defendant must show some evidence that would permit the jury rationally to find that he knowingly discharged a firearm at or in the direction of the victim but did not intend to kill him or to cause him to suffer serious bodily injury. *Guzman v. State*, 188 S.W.3d 185, 189–92 (Tex. Crim. App. 2006). Kitchens cannot make this showing.

Kitchens implicitly admitted that he intended to kill or cause serious bodily injury to Desoto by arguing that he acted in self-defense, and he explicitly testified that he shot Desoto until he no longer thought that Desoto was a threat. He explained that he shot Desoto to "neutralize" the threat that Desoto allegedly posed to him. Last, Kitchens cannot point to any evidence to support the claim that he did not intend to kill or to cause serious bodily injury to Desoto. The video of Kitchens shooting Desoto five times at close range—including one shot to the head—precludes a jury from rationally finding that Kitchens knowingly discharged his firearm at or in the direction of Desoto without the intent to kill or to cause him

17

serious bodily injury.[2] Accordingly, the trial court did not err in refusing to submit the lesser-included offense of deadly conduct. We overrule issue two.

### Evidentiary Rulings

In issues three and four, Kitchens complains that the trial court abused its discretion in excluding hearsay. Specifically, Kitchens asserts in issue three that the trial court erred in excluding the two recorded statements of Kitchens that Cooke took. Kitchens sought to rebut Cooke's testimony that what Kitchens told him in his recorded statements about the shooting was inconsistent with the video of the shooting, but the trial court sustained the State's hearsay objection.

The State first responds to issue three by asserting that Kitchens failed to preserve it for appellate review because Kitchens did not make an offer of proof at trial.[3] *See* TEX. R. EVID. 103(a)(2) (providing in part that party may claim error in

---

[2]　In response to the argument that self-defense is inconsistent with the three lesser-included offenses, Kitchens relies on *Bignall v. State* and its statement that the jury is free to "selectively believe all or part of the evidence admitted at trial." 887 S.W.2d 21, 24 (Tex. Crim. App. 1994). We find this argument unavailing, for the court continued, "[W]e are satisfied it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense; there must be some evidence directly germane to a lesser included offense for the factfinder to consider before an instruction on a lesser included offense is warranted." *Id.* As we have explained, Kitchens is unable to point to any evidence in the record that would permit a jury to rationally find that, if he is guilty, he is guilty only of any of the lesser-included offenses.

[3]　In his original opening brief—Kitchens filed an amended opening brief—Kitchens attached a bill of exceptions that was purportedly filed on June 18, 2018, two months after trial. The bill of exceptions lacks a file mark and is not in the clerk's record. The bill fails to comply with Rule of Appellate Procedure 33.2(c) in many

trial court's exclusion of evidence if party informs court of its substance by offer of proof). Kitchens's reply brief does not address the State's preservation argument.

To preserve for appellate review a complaint that the trial court erroneously excluded evidence, the proponent of the evidence must perfect an offer of proof or a bill of exception. *Tristan v. State*, 393 S.W.3d 806, 810 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing *Guidry v. State*, 9 S.W.3d 133, 153 (Tex. Crim. App. 1999)). This requirement allows the trial court to reconsider its ruling in light of the actual evidence and makes it possible for an appellate court to determine whether the exclusion is erroneous and harmful. *Mays v. State*, 285 S.W.3d 884, 890 (Tex. Crim. App. 2009).

After the trial court sustained the State's hearsay objection to the two audio tapes of the recorded statements offered into evidence, Kitchens did not make an offer of proof of the recorded statements: Kitchens did not offer transcripts of the recorded statements, and his counsel did not make a "reasonably specific summary" of the recorded statements, stating only, "They're [the jurors were]

respects. TEX. R. APP. P. 33.2(c) (setting forth procedure for perfecting formal bill of exception). Further, Kitchens's amended opening brief merely cites to the attachment to his superseded original opening brief in an apparent attempt to establish preservation. We therefore conclude that the bill of exceptions attached to Kitchens's superseded original opening brief presents nothing for review. *See Cherqui v. Westheimer St. Festival Corp.*, 116 S.W.3d 337, 342 & n.2 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (holding that attachment of transcript from criminal trial to appellate brief did not preserve issue for appellate review); *Brown v. State*, 866 S.W.2d 675, 678 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd) (holding that appellate court should not consider material outside record that was improperly included in or attached to party's brief).

19

entitled to see what [Kitchens] told [Cooke] that caused the conflict." *See Warner v. State*, 969 S.W.2d 1, 2 (Tex. Crim. App. 1998); *Balderama v. State*, 421 S.W.3d 247, 250 (Tex. App.—San Antonio 2013, no pet.); *see also* O'CONNOR'S TEXAS RULES * CIVIL TRIALS 847 (2019) (stating procedure for offer of proof of tape-recorded evidence) (citing *Gunn v. McCoy*, 645 S.W.3d 645, 666 (Tex. 2018); and *Chubb Lloyds Ins. v. Kizer*, 943 S.W.2d 946, 949 (Tex. App.—Fort Worth 1997, writ denied), *overruled on other grounds by Tex. Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873 (Tex. 1999)). Because Kitchens did not preserve issue three for appellate review, we overrule it.[4] *See Balderama*, 421 S.W.3d at 250.

In issue four, Kitchens asserts that the trial court erred in excluding a hearsay statement that Desoto's employer made to Cooke during his investigation. Specifically, on cross-examination, Cooke testified that he put all important information in his case report and that if a witness had told him that Desoto could get violent when he was angry, that would be an important fact. Because Orlando Aviles, Desoto's boss, had told Cooke in a recorded interview that Desoto could be violent, and because Cooke had omitted that information in his case report, Kitchens sought to play Cooke's recorded interview of Aviles for the allegedly

---

[4] Were we to address issue three, any error in the exclusion of Kitchens's recorded statements would have been harmless because the exclusion did not prevent Kitchens in any way from presenting his defensive theory of self-defense. *See Walters v. State*, 247 S.W.3d 204, 221 (Tex. Crim. App. 2007); *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002).

limited purpose of impeaching Cooke as to what he believed was important to his investigation.[5] The trial court sustained the State's hearsay objection.

Kitchens further argued that the purpose for playing Aviles's recorded statement that Desoto could be violent was not hearsay because it was not offered to prove the matter being asserted—that Desoto could get violent when he was angry—but was offered to impeach Cooke about the inadequacy of his report. The trial judge remarked that Cooke's report was hearsay and that his recorded interview of Aviles was hearsay and stated, "Those are out-of-court statements offered for the truth of the matter asserted and those are hearsay."

We review a trial court's evidentiary ruling for an abuse of discretion. *See De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009). If the trial court's ruling was within the zone of reasonable disagreement, we will not disturb its ruling. *See Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). We will uphold the ruling if it is reasonably supported by the record and correct on any theory of law applicable to the case. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002); *Roderick v. State*, 494 S.W.3d 868, 874 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

Kitchens also reiterates his impeachment argument.[6] He further argues that Aviles's hearsay statement was admissible to show Desoto's violent character,[7]

---

[5]    Aviles was not available as a witness at trial.

21

which of course undercuts his argument that it was not being offered to prove the truth of the matter asserted. But he fails to present any authority allowing for the admission of Aviles's hearsay statement under either theory. Accordingly, we cannot say that the trial court abused its discretion in concluding that Kitchens sought to offer Aviles's hearsay statement to prove the truth of the matter asserted, and we overrule issue four.

### Sudden Passion

In issue five, Kitchens argues that the trial court erred by refusing his request for a jury instruction on sudden passion in the punishment charge. Kitchens argues that he was entitled to a sudden-passion jury instruction because Desoto's threats made Kitchens fear for his life and provoked Kitchens into shooting Desoto.

A sudden-passion jury finding in the punishment phase reduces the first-degree felony offense of murder to a second-degree felony, which carries a

---

[6] We disagree with the State's contention that Kitchens failed to preserve issue four for appellate review. His trial attorney made an offer of proof, stating, "I have a recording of this interview with the witness that said Mr. Desoto could get violent." *See* TEX. R. EVID. 103(a)(2); *Tristan v. State*, 393 S.W.3d 806, 810 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *Lone Starr Multi-Theatres, Ltd. v. Max Interests, Ltd.*, 365 S.W.3d 688, 703 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

[7] Kitchens argues that evidence of Desoto's violent character was admissible under *Torres v. State*, 117 S.W.3d 891 (Tex. Crim. App. 2003) and *Torres v. State*, 71 S.W.3d 758 (Tex. Crim. App. 2002).

punishment range of two to twenty years.[8] TEX. PENAL CODE §§ 12.33(a), 19.02(d).

A defendant is entitled to a sudden-passion jury instruction if the record "at least

minimally" supports the following inferences:

1. that the defendant was acting under the immediate influence of passion, such as terror, anger, rage, or resentment;
2. that his sudden passion was in fact induced by some provocation by the deceased, which provocation would commonly produce such a passion in a person of ordinary temper;
3. that he committed the murder before regaining his capacity for cool reflection; and
4. that a causal connection existed "between the provocation, passion, and homicide."

---

[8] In *Benavides v. State*, this court explained the change in the law on sudden passion from being an element of manslaughter to a punishment-stage mitigation issue for a defendant found guilty of murder:

> For murders like this one, occurring before September 1, 1994, the requirement to negate sudden passion *as an element of murder* was imposed by *Cobarrubio v. State*, 675 S.W.2d 749, 751 (Tex. Crim. App. 1983). That implied element of murder was deleted effective September 1, 1994 by legislation abolishing the offense of voluntary manslaughter and instead making the issue of "sudden passion arising from adequate cause" a punishment-stage issue for defendants found guilty of murder. *See* Act of May 29, 1993, 73d Leg., R.S., ch. 900, sec. 1.01, §§ 19.02(d) (addition of sudden passion as punishment-stage issue in murder prosecution), 19.04 (merging former offenses of voluntary and involuntary manslaughter into single offense of manslaughter and deleting sudden passion as element of offense), sec. 1.19(a) (effective date), 1993 Tex. Gen. Laws 3587, 3613–14, 3705.

992 S.W.2d 511, 523–24 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (en banc). Despite this change in the law, sudden-passion voluntary-manslaughter cases are relevant authority because the statutory definitions of "sudden passion" and "adequate cause" remained the same. *See, e.g.*, *Wooten v. State*, 400 S.W.3d 601, 604–05 (Tex. Crim. App. 2013); *Trevino v. State*, 100 S.W.3d 232, 236–38 (Tex. Crim. App. 2003).

*Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013); *McKinney v. State*,

179 S.W.3d 565, 569 (Tex. Crim. App. 2005).

A defendant has the burden to prove the issue of sudden passion arising from

an adequate cause at the punishment hearing by a preponderance of the evidence.

TEX. PENAL CODE § 19.02(d). In *Wooten*, the Court of Criminal Appeals outlined

the standard of review for charge error premised on the trial court's refusal of a

sudden-passion jury instruction:

> When an appellant protests that the trial court erred not to grant his
> request to charge the jury regarding sudden passion, a reviewing court
> must first determine whether the complained-of error exists. If the
> reviewing court agrees that a trial court erred by failing to submit a
> sudden passion instruction, it then analyzes whether the error harmed
> the appellant. Harm does not emanate from the mere failure to include
> the requested instruction. A reviewing court undertakes a harm
> analysis by following the standards as set out in the Texas Code of
> Criminal Procedure Article 36.19. If the error is preserved, the record
> must demonstrate that the appellant has suffered "some harm." In an
> *Almanza* harm analysis, "burdens of proof or persuasion have no
> place[.]" Harm must be evaluated in light of the complete jury charge,
> the arguments of counsel, the entirety of the evidence, including the
> contested issues and weight of the probative evidence, and any other
> relevant factors revealed by the record as a whole. To assay harm, we
> focus on the evidence and record to determine the likelihood that a
> jury would have believed that the appellant acted out of sudden
> passion had it been given the instruction.

400 S.W.3d at 606 (citations in footnotes omitted).

The Penal Code defines "adequate cause" as a "cause that would commonly

produce a degree of anger, rage, resentment, or *terror* in a person of ordinary

temper, sufficient to render the mind incapable of cool reflection." TEX. PENAL

CODE § 19.02(a)(1) (emphasis added). "The definition of adequate cause ... is both objective and subjective." *McCartney v. State*, 542 S.W.2d 156, 160 (Tex. Crim. App. 1976). "It is objective because it views the alleged provocation through the eyes of the ordinary man." *Id.* "Evidence of a cause which produced one of the listed responses [anger, rage, resentment, or terror] in the accused because of the accused's susceptibilities is not enough unless the cause would also produce the response in an ordinary person." *Merchant v. State*, 810 S.W.2d 305, 310 (Tex. App.—Dallas 1991, pet. ref'd) (citing *Gonzales v. State*, 689 S.W.2d 900, 903 (Tex. Crim. App. 1985)). Adequate cause "is subjective because the fact-finder must view from the actor's standpoint in order to determine 'the condition of the mind of the accused at the time of the offense . . . .' " *McCartney*, 542 S.W.2d at 160; *see Merchant*, 810 S.W.2d at 310 (the "subjective analysis requires some evidence of the condition of the accused's mind at the time of the offense").

"Fear" is defined as "to be afraid of," and "terror" is defined as "a state of intense fear." *Wooten*, 400 S.W.3d at 606–07 & n.29. A "mere claim of fear" by a defendant does not, standing alone, establish the existence of sudden passion. *See id.*; *Daniels v. State*, 645 S.W.2d 459, 460 (Tex. Crim. App. 1983); *Howell v. State*, 757 S.W.2d 513, 516 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd). "Only such fear, if provoked by the person killed or by someone acting with that person, as would produce a degree of terror that would overcome the rational

functioning of the mind could meet the statutory requirements." *Howell*, 757 S.W.2d at 516; *see also Orcasitas v. State*, 511 S.W.3d 213, 225 (Tex. App.—San Antonio 2015, no pet.). "Evidence of the accused's fear is not enough unless the cause of the accused's fear could produce fear that rises to a level of terror which makes a person of ordinary temper incapable of cool reflection." *Merchant*, 810 S.W.2d at 310 (citing *Daniels*, 645 S.W.2d at 460).

Sudden passion "means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE § 19.02(a)(2). " 'Sudden passion' has been described as an excited and agitated state of mind at the time of the killing caused by direct provocation by the victim." *Benavides v. State*, 992 S.W.2d 511, 526 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) (en banc) (citing *Hobson v. State*, 644 S.W.2d 473, 478 n.10 (Tex. Crim. App. 1983)).

A sudden-passion jury instruction first requires that the record contain objective evidence that direct provocation by the victim or someone acting with the victim occurred at the time of the killing. *Merchant*, 810 S.W.2d at 310. Second, there must be "evidence from which the jury could subjectively decide the accused killed the victim while in an excited and agitated state of mind arising out of the

26

direct provocation. There must be evidence that the accused acted in the throes of actual, subjective passion." *Id.*

Sudden passion and self-defense are not mutually exclusive, and a jury's rejection of self-defense does not necessarily preclude a sudden-passion instruction. *See Beltran v. State*, 472 S.W.3d 283, 290 (Tex. Crim. App. 2015). This court has noted "how hard it is to distinguish between evidence raising self-defense and evidence raising sudden passion. *Benavides*, 992 S.W.2d at 525. "It would be 'a rare instance' when issues of self-defense do not also raise issues of sudden passion," and "trial courts, on request, are now generally well advised to give both instructions." *Id.*

The trial court should give a jury instruction on sudden passion if it is raised by the evidence, even if that evidence is weak, impeached, contradicted, or unbelievable, but the evidence cannot be so weak, contested, or incredible that it could not support such a finding by a rational jury. *McKinney*, 179 S.W.3d at 569. "An appellate court's duty is to look at the evidence supporting the charge of sudden passion, not the evidence refuting it." *Beltran*, 472 S.W.3d at 294.

The evidence showed that Kitchens's shop, the place of the shooting, was in a high-crime area. Kitchens testified that, when he moved his business into the shop, he found bullet holes in one of the bay's garage doors. Kitchens said that, on the day of the shooting, Desoto rode in to his auto-repair shop on a Harley-

27

Davidson motorcycle with the appearance of a biker, a manner substantially different from Kitchens's usual customers. Kitchens first noticed Desoto on his video surveillance monitor as Desoto's motorcycle was arriving at the shop, and Finch, who was in the office with Kitchens, also alerted Kitchens that a motorcycle was pulling up. Kitchens was "concerned" by Desoto's "slow-rolling" arrival on his motorcycle. Finch left the office before Desoto came inside.

Within a period of less than three minutes, Desoto, a much larger man than Kitchens, entered the shop's small office space. Desoto walked the twelve feet from the front door to Kitchens's desk and asked for the whereabouts of a man who neither worked at nor was present at Kitchens's shop. According to Kitchens, Desoto seemed "irritated" and "uneasy." Kitchens told Desoto that there was no one present who fit the description of the man he was looking for, which made Desoto "angrier" and which Kitchens said caused him to be "terrified" of Desoto. Desoto began waving his hands and "pushed his hands like he was pushing away." Desoto told Kitchens that he "didn't fucking get it" and turned and began walking back to the door, and then said to Kitchens, as he moved towards and was opening the door, that "shit like this was why they would be back to beat [Kitchens's] ass." Kitchens said that Desoto's statement terrified him and that he responded to Desoto "with the same thing he said out of disbelief."

Desoto stepped back from the door, closed it, turned around, and "yelled that he was actually going to fuck [Kitchens] up right now." Finch, who was in the shop's bay area, testified that he heard Desoto, but not Kitchens, yelling. According to Kitchens, he thought he was about to be beaten to death by Desoto because "it would be nothing" for the 100-plus pounds bigger Desoto to "beat me to a pulp and not even blink." Kitchens drew his pistol from his desk drawer, stepped towards Desoto, and shot Desoto. Kitchens testified that he shot Desoto because he thought Desoto was going to kill him. In response to being asked why he thought that, Kitchens said, "Because there was this large stranger in my office that thought I was hiding somebody from him[, and] that was looking for somebody that he seemed angry about." Kitchens also testified that he believed that Desoto "decided to stay and follow through [with his threat] to beat [Kitchens] to death or to seriously hurt [Kitchens]."

Detective Cooke was notified of the shooting around 10:30 a.m. and responded sometime after 11:00. Cooke stated that when he first saw Kitchens, which was over an hour after the shooting, Kitchens was distraught, crying, and "visibly upset."

We conclude that the above evidence was sufficient objective and subjective evidence of sudden passion arising from an adequate cause to support the submission of a sudden-passion instruction in the punishment phase. *See, e.g.,*

29

*Beltran*, 472 S.W.3d at 293–95; *Trevino v. State*, 100 S.W.3d 232, 239 (Tex. Crim. App. 2003); *Medlock v. State*, 591 S.W.2d 485, 486–87 (Tex. Crim. App. [Panel Op.] 1979); *Anderson v. State*, 221 S.W. 285, 285–86 (Tex. Crim. App. 1920); *Benavides*, 992 S.W.2d at 526–27.

While the jury might have found against Kitchens on sudden passion, as it did with self-defense, the evidence was not so weak, contested, or incredible that it could not support such a finding by a rational jury. *See McKinney*, 179 S.W.3d at 569; *see also Beltran*, 472 S.W.3d at 294 ("While we agree that this evidence may be weak and perhaps even unbelievable (as evidenced by the jury's rejection of self-defense), it was nevertheless enough to support an inference that Beltran acted under the immediate influence of terror."); *id.* at 295 ("The jury could arguably have deduced, from Beltran's testimony, that McKnight's sexual assault of Beltran and Beltran's sudden reaction to such sexual assault, triggered a chain reaction that resulted in McKnight's death. . . .").

The trial court erred in refusing Kitchens's request for a sudden-passion instruction. *See Benavides*, 992 S.W.2d at 525 ("It would be 'a rare instance' when issues of self-defense do not also raise issues of sudden passion," and "trial courts, on request, are now generally well advised to give both instructions."). We therefore turn to a harm analysis.

30

Because Kitchens requested a sudden-passion instruction, we review the error for "some harm," focusing "on the evidence and record to determine the likelihood that a jury would have believed that the appellant acted out of sudden passion had it been given the instruction." *Wooten*, 400 S.W.3d at 606. Our harm analysis includes consideration of the jury's rejection of Kitchens's self-defense claim because, "except in rare instances, when the State's evidence is sufficient to overcome a claim of self-defense, it will also be sufficient to show the absence of sudden passion." *Benavides*, 992 S.W.2d at 525. But as the Court of Criminal Appeals has explained, harm is case-specific: "The evidence in a case in which a jury rejected a claim of self-defense could demonstrate also that the defendant was not harmed by the failure to receive a sudden passion charge, but the evidence in another such case might not demonstrate a lack of harm." *Trevino*, 100 S.W.3d at 242.

Citing *Herrera v. State*, the State argues that Kitchens was not harmed because of the evidence that Kitchens prepared himself for the encounter with Desoto by checking to make sure his gun was in his desk, which was inconsistent with sudden passion and made it "extremely unlikely" that the jury would have found sudden passion. 513 S.W.3d 223, 229 (Tex. App.—San Antonio 2016, no pet.) (finding no harm when trial court failed to include requested sudden-passion instruction, noting evidence that defendant anticipated and prepared for

31

altercation). The State also argues that Kitchens was not harmed because the jury's fifteen-year sentence is within the punishment range had the jury found that he acted under sudden passion. Conversely, Kitchens argues that the jury's fifteen-year sentence with a punishment range of five to ninety-nine years demonstrates some harm because the jury likely would have given an even lower sentence if the range had been two to twenty years.

In *Beltran*, the Court of Criminal Appeals remanded the case for a harm analysis after finding trial-court error in the refusal to submit a sudden-passion instruction. *Beltran*, 472 S.W.3d at 295–96. In an unpublished but otherwise instructive memorandum opinion, the Dallas Court of Appeals aptly addressed harm in the context of a jury's rejection of a self-defense claim. *See Beltran v. State*, No. 05-12-01647-CR, 2016 WL 3749707, at *5–7 (Tex. App.—Dallas July 7, 2016, no pet.) (mem. op., not designated for publication). The Dallas court considered and contrasted *Wooten* and *Trevino*, concluding that *Beltran* was more similar to *Trevino*. *Id.* at *6–7.

Viewing the record as a whole, including the punishment-phase's closing arguments and the jury's fifteen-year sentence, we conclude that this case is more similar to *Trevino*. A likelihood exists that the jury could have rejected Kitchens's self-defense claim yet found that he acted with sudden passion. Indeed, the best explanation for the jury's fifteen-year sentence for a murder captured on video is

32

that the jury concluded that Kitchens did not act in self-defense but that he overreacted to Desoto's threats. And we are further persuaded that some harm is shown by the fifteen-year sentence, given that the State suggested a thirty- to fifty-year sentence. A likelihood exists that the jury could have assessed an even lower sentence with a punishment range between two to twenty years, rather than one between five to ninety-nine years. Therefore, we sustain issue five.

## Conclusion

We affirm the trial court's judgment of guilt but remand the case for a new punishment hearing consistent with this opinion.

Richard Hightower
Justice

Panel consists of Justices Kelly, Hightower, and Countiss.

Do not publish. TEX. R. APP. P. 47.2(b).